UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------------X    Case No. 24-cv-6221

ANEES HASNAIN AND LUIS MEJIA,

                                 Plaintiffs,

           -against-

THE CITY OF NEW YORK, NYPD POLICE OFFICER NICHOLAS ALBERGO (TAX 954471), NYPD POLICE OFFICER ALLYSON ECHAVARRIA (TAX 951703), NYPD POLICE OFFICER FREDDY SUAZO; NYPD SGT. GIANFRANCO RUBINO; NYPD POLICE OFFICER BENJAMIN BEIRO; NYPD SGT. ROBERT LIVINGSTON; NYPD CAPTAIN ANGEL AMAYA; NYPD POLICE OFFICER JASON CASTILLO; NYPD POLICE OFFICER NICHOLAS NOTO; NYPD POLICE OFFICER NICHOLAS BLAKE; NYPD POLICE OFFICER JOHNNY SOLORZANO; AND NYPD POLICE OFFICER DIANA SCHUTZ;

                             Defendants.

--------------------------------------------------------------------------------X

**FIRST AMENDED COMPLAINT**

**PLAINTIFF DEMANDS A TRIAL BY JURY**

      Plaintiffs, ANEES HASNAIN AND LUIS MEJIA, by their attorneys, COHEN&GREEN P.L.L.C., hereby complain of the Defendants as follows:

**PARTIES, VENUE AND JURISDICTION**

1.  At all times mentioned herein, plaintiffs, ANEES HASNAIN AND LUIS MEJIA, were adult residents of New York County, in the City and State of New York.

2.  At all relevant times mentioned herein, defendant, City of New York ("New York City"), was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD"), and their employees.

3.  At all times hereinafter mentioned, defendant, NYPD POLICE OFFICER NICHOLAS ALBERGO (TAX 954471), was an adult man employed by the City of New York as a member of the NYPD assigned to the NYPD Strategic Response Group 3 in Brooklyn. He wore a blue

NYPD uniform and NYPD riot gear such as a mask and a helmet. Defendant ALBERGO is sued herein in his official and individual capacities.

4. At all times hereinafter mentioned, defendant, NYPD POLICE OFFICER ALLYSON ECHAVARRIA, née DAVILA (TAX 951703) was an adult woman employed by the City of New York as a member of the NYPD assigned to the NYPD Strategic Response Group. Defendant Echavarria is sued herein in her official and individual capacities.

5. Defendants NYPD POLICE OFFICER FREDDY SUAZO, POLICE OFFICER FREDDY SUAZO; NYPD SGT. GIANFRANCO RUBINO; NYPD POLICE OFFICER BENJAMIN BEIRO; NYPD SGT. ROBERT LIVINGSTON; NYPD CAPTAIN ANGEL AMAYA; NYPD POLICE OFFICER JASON CASTILLO; NYPD POLICE OFFICER NICHOLAS NOTO; NYPD POLICE OFFICER NICHOLAS BLAKE; NYPD POLICE OFFICER JOHNNY SOLORZANO; AND NYPD POLICE OFFICER DIANA SCHUTZ[1] were identified by the City of New York pursuant to the Court's Order as being the NYPD members previously identified as John and Jane Does, and who were involved in the assault and arrest of each Plaintiff. These Defendants are sued herein in their official and individual capacities.

6. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367, and 42 U.S.C. § 1983.

---

[1] The City identified Suazo, Rubino, Beiro, Livingston, Amaya, and Castillo as being involved with Hasnain's arrest; and the partially overlapping set of Amaya ,Castillo, Noto, Blake, Solorzano, and Schutz as being involved with Mejia's. The initial complaint also identified Albergo and Echavarria as involved with Plaintiff Hasnain's arrest.

For ease of reference, then, the "Mejia Defendants" are: Suazo, Rubino, Beiro, Livingston, Amaya, Castillo, Albergo, and Echavarria.

And the "Hasnain Defendants" are: Amaya ,Castillo, Noto, Blake, Solorzano, and Schutz.

7. Venue is proper pursuant to 28 U.S.C. § 1391, et seq., in the Southern District of New York, where plaintiffs and defendant City of New York reside, and where the majority of the actions complained of herein occurred.

8. This action has been initiated within three years of the accrual of plaintiffs' claims pursuant to federal law.

## **RELEVANT FACTS**

9. On September 13, 2021, at about 6:00 p.m., plaintiffs were lawfully present at a protest at or around the Fifth Avenue entrance of the Metropolitan Museum of Art, near East 81st Street and Fifth Avenue, in the County, City, and State of New York.

10. At this time, the one of the Hansain Defendants wearing a white shirt (indicating a supervisor rank) pointed at Plaintiff Hasnain.

11. Following this, Defendant Albergo approached Plaintiff Hasnain and began violently grabbing her (Hasnain's) head.

12. The Hasnain Defendants then grabbed Hasnain and slammed her to the ground, causing her to lose consciousness and sustain a concussion.

13. Plaintiff Hasnain was wearing a bicycle helmet at the time, and the Hasnain Defendants slammed her to the ground with such force that she was concussed through the helmet.

14. At about the same time, the Mejia Defendants began attacking plaintiff Mejia by grabbing him, pulling him in multiple directions, and dragging him to the ground.

15. Specifically, Defendant Albergo injured plaintiff Mejia's left arm and elbow by forcing Plaintiff Mejia's arm into a straight position, and Albergo used his arm to yank at Plaintiff Mejia's extended elbow.

16. The Hasnain Defendants then handcuffed plaintiff Hasnain without any justification and applied the handcuffs to plaintiff Hasnain excessively tightly.

17. One of the Mejia Defendants handcuffed plaintiff Mejia without any justification and applied the handcuffs to plaintiff Mejia excessively tightly.

18. Defendants detained and arrested plaintiffs without consent, probable cause, or lawful justification.

19. Defendants used unreasonable and excessive physical force in detaining and arresting plaintiffs.

20. As a result of the force used by defendants, Plaintiff Mejia sustained pain and injuries to his left arm and elbow.

21. As a result of the force used by defendants, Plaintiff Hasnain sustained pain and injuries including loss of consciousness and a concussion.

22.  None of the Defendants read plaintiffs their rights.

23. Rather than issuing Plaintiff Mejia a summons or other legal process on the street, NYPD officers loaded Plaintiff into a prisoner transport vehicle and took Plaintiff to the 28th Precinct, where Plaintiff remained in police custody.

24. Rather than issuing Plaintiff Hasnain a summons or other legal process on the street, NYPD officers loaded Plaintiff into a prisoner transport vehicle and took Plaintiff to the 28th Precinct where Plaintiff remained in police custody.

25. Plaintiffs were in NYPD custody for approximately 5 to 7 hours.

26. Because NYPD officers arrested plaintiffs in connection with a protest, they subjected plaintiffs to unreasonable and lengthy NYPD large-scale arrest processing, to which other

similarly situated people detained by the NYPD for the same offense(s) with which plaintiffs were charged outside of the protest context are not subjected.

27. As a result, that arrest processing unjustifiably and unreasonably lengthened plaintiffs' detention; curtailed and prevented plaintiffs from exercising plaintiffs rights to speech, association, and assembly, and to petition the government; cast a chill on plaintiffs desire to participate in such protected expression in the future; and otherwise injured and damaged Plaintiff.

28. NYPD officers unlawfully searched each plaintiff's person.

29. During Plaintiff's time in custody, no NYPD officer offered Plaintiff a phone call. And, as the arrest processing procedures the NYPD applied to Plaintiff's arrest because it was made in connection with a protest did not allow for legal counsel or anyone else to contact Plaintiff, or communicate with NYPD officers about Plaintiff's arrest or arrest processing status, no one could locate or contact Plaintiff while Plaintiff was in custody.

30. Plaintiff Hasnain was held in a small cell with approximately 5 other arrestees. The cell was crowded, and not designed to house this many people at one time.

31. After approximately 5 to 7 hours, Defendant Echavarria issued Plaintiff Hasnain two summonses based on false allegations that she knew to be false when she issued the summonses.

32. Plaintiff Hasnain's charges were resolved in her favor when Defendant Echavarria failed to file the summonses with the court.

33. After approximately 7 hours, Defendant Mejia was released from custody.

34. Defendant Mejia's charges were resolved in his favor on grounds consistent with his innocence when he acceded to an ACD.

35. Plaintiffs were unlawfully deprived of meaningful access to basic necessities for an extended period, and subjected to filthy, crowded, and unsanitary conditions of confinement, while in NYPD custody.

36. Upon information and belief, Members of the NYPD created official NYPD paperwork relying on fabricated evidence, including about purported observations of plaintiffs' alleged pre-arrest conduct, and/or forwarded such fabricated evidence to prosecutors and/or initiated charges against plaintiffs, relying on fabricated evidence and without probable cause.

37. At no time did defendants have probable cause to seize, detain or arrest the plaintiffs, nor to use any force on plaintiffs, nor was it reasonable for the defendants to believe that such cause existed.

38. At no time did any of the defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the heretofore conduct engaged in by their fellow officers.

39. That at all times relevant herein, the defendants were acting within the scope of their employment, and their acts were done in furtherance of the City of New York's interests and without legal justification or excuse.

***NYPD's Policies and Practices Relating to Dispersal Orders and Opportunity to Comply***

40. Defendants did not issue Plaintiffs any order before they detained and assaulted them.

41. Upon information and belief, there is virtually no NYPD training – and certainly no meaningful NYPD training - focusing on how to utilize the tactics taught at the academy and in in-service training without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time, and a path of egress when issuing a dispersal order, and the like.

42. Thus, Plaintiffs were given no meaningful opportunity to comply with a(n unlawful) dispersal order because it is the policy, practice, and effect of NYPD trainings that officers frequently do not give such opportunities.

43. The City and the NYPD have been sued repeatedly for the failure to provide meaningful opportunities to comply with dispersal orders, including (but not limited to):

    a. *Peat v. City of New York,* No. 12 Civ. 08230 (S.D.N.Y.), fifteen plaintiffs, during the Occupy Wall Street protests, were arrested on January 1, 2012, on the sidewalk in the East Village and settled a case with Defendant City of New York for $598,000.  The settled complaint alleged that plaintiffs were peacefully and lawfully protesting when executive members of the NYPD blocked their path on the sidewalk, encircled them on three sides and a building line on the fourth side. The NYPD made dispersal announcements without providing sufficient time or a path of egress as members of the scooter task force blocked the protesters path of egress.

    b. *Case v. City of New York,* 14-cv-9148 (S.D.N.Y.), complaining of NYPD's policy and practice of failing to ensure that constitutionally meaningful and adequate dispersal orders and opportunities to disperse are given prior to effecting arrests in connection with First Amendment assemblies.  *Case* is now trial-ready, including on the opportunity-to-disperse claims.  In the decision denying summary judgment in *Case*, the Court also found that the City had notice of the failure to train alleged here for *Monell* purposes.  *See Case v. City of New York*, 408 F. Supp. 3d 313, 329-30 (S.D.N.Y. 2019).

    c.  *Dinler v. City of New York,* 04-cv-7921 (S.D.N.Y.), granting plaintiffs summary judgment (decision at 2012 WL 4513352, 2012 U.S. Dist. LEXIS 141851) on claims for unlawful arrest where no meaningful opportunity to comply with a dispersal order was given.

44. As noted above, in *Case*, Judge Torres concluded that the same policy and training failures alleged here presented an issue for trial on whether NYPD's policies gave rise to *Monell* liability for "fail[ure] to train officers with respect to providing (1) adequate dispersal notice and (2) a meaningful opportunity to comply with such notice."  408 F. Supp. 3d at 329.

45. As also referenced in *Case* (408 F. Supp. 3d at 329, *citing* Pl. MOL (ECF No. 136) at 34-37), the *only* time the topic of opportunity to disperse comes up in NYPD's training is in a factual summary of a case, appearing in a 1971 Legal Department Bulletin.

46. That is, upon information and belief, there is no training provided to NYPD officers on ensuring protesters are provided a meaningful opportunity to comply with orders to disperse.

47. Upon further information and belief, the NYPD and City do not train officers on (1) informing demonstrators that they must move or why; how many warnings to give before taking enforcement action; (2) what constitutes a meaningful time within which to comply with a dispersal order or the length of time to give people to comply; or (3) the need to give a meaningful opportunity to comply (i.e., a route through which to disperse).  *See, e.g., Case*, ECF No. 136 at 34-35.

48. And, according to the Corporation Counsel itself, the NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests.

49. Indeed, upon information and belief, there have been no protest-related after action reviews undertaken between the 2004 Republican National Convention and until the events of the George Floyd protest – despite numerous lawsuits, judgments, and settlements on the issue.

50. This is in part because of other problematic policies and practices. For example, in a deposition in *Packard v. City of New York,* 15-cv-7130 (S.D.N.Y.), the City of New York testified that in regards to protest police training it did not review (i) decline to prosecute decisions, (ii) conviction conversion rates, or (iii) allegations and settlements in lawsuits relating to protest.

51. That is, Defendant City apparently does not even review allegations in lawsuits filed by protesters claiming to be falsely arrested during protests in reviewing their policies, in effect taking the position that there is nothing to be learned from lawsuits and settlements.

52. For example, in a 2017 deposition, Defendant City could identify no impact litigation against Defendant City between 2000 and 2011 had on Defendant City's relevant policies, practices, and customs.

53. Thus, in sum, Defendants NYPD and the City have a policy and practice of failing to provide meaningful opportunities to comply with dispersal orders at protests, and that policy resulted in Plaintiffs' arrest and injuries.

**The NYPD's History of Mishandling Certain Protests**

54. The extensive deprivations of constitutional rights suffered by Plaintiffs and others during the 2020 protests are part of the NYPD's long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, *inter alia*, protests denouncing the murder of Amadou Diallo in 1999, as well as protests against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National

Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

55. The NYPD response to the protests in New York City the summer of 2020 was in line with its history of violent and unconstitutional responses to past protests challenging police conduct in New York City, including its treatment of certain First Amendment assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

56. For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, use of pepper spray, riding horses into crowds and batons strikes to disperse protestors, and kettling to move protestors from specific locations to effectuate mass arrests.[2]

57. The next year, during the police "Operation Overlord II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of kettling tactics, excessive force and mass arrests, and excessive and unreasonable detention.[3]

58. The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004.[4]

59. Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Lawyers Guild – New York City Chapter Legal Observers, as well as kettling tactics to move protestors or initiate mass arrests.[5]

---

[2] *See, e.g.*, N.Y. Civil Liberties Union, Arresting Protest (2003), *available at* https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.

[3] *See, e.g*., N.Y. Civil Liberties Union, Rights and Wrongs at the RNC (2005), *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.

[4] *See, e.g., Callaghan v. City of New York*, 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.).

[5] *See People of the State of New York v. City of New York et al.*, 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

60. Additionally, Defendants have employed the same tactics and practices against Black Lives

Matter, police accountability, and other, similar protests, over the intervening years.

61. Following NYPD conduct during these and other protests, the City of New York and the NYPD

and its members have been sued repeatedly by protestors who alleged that they had been

unlawfully detained, kettled, arrested, subjected to mass arrest, unreasonable and prolonger

detentions and violations of their First Amendment and other, related rights, much in the same

manner as have the Plaintiffs in this case.

62. In many of these cases Defendants employed tactics developed and modified over the course

of many years by Defendants Shea, Monahan, and their predecessors and by other defendant

City policymakers at and in connection with other demonstrations in the City dating back to

around 2000 and continuing through the present, including the policies, practices, and customs

complained of herein, and also described and litigated in the following cases:

    a.   *Mandal v. City of New York.,* 02-cv-1234 (WHP)(FM) (S.D.N.Y.) and related cases challenging NYPD's written and unwritten policies and practices enacted after the police shooting of Amadou Diallo in 1999 and formalized in writing as early as 2001. As a result of these policies, the NYPD began detaining and fully processing people arrested for non-criminal violations who were otherwise eligible to be processed and released with Desk Appearance Tickets ("DATs"). *See, e.g., "Mandal I,"* No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 02-cv-6537 (WHP), 2006 WL 2950235, at \*4-7 (S.D.N.Y. Oct. 17, 2006) (denying summary judgment on plaintiffs' Fourteenth Amendment Equal Protection and First Amendment-based claims that the policies "constituted facial violations of [plaintiffs'] First Amendment rights because they were denied DATs or summonses based on the fact that they participated in demonstrations"); *Mandal v. City of New York* ("*Mandal II*"), No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 2007 WL 3376897, at \*2 (S.D.N.Y. Nov. 13, 2007) ("*Mandal II*") (noting that approximately 38 *Mandal* plaintiffs prevailed at trial on claims that "the City had an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs");

    b.   *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia,* (1) NYPD policy of detaining perceived protesters who were otherwise eligible to be released earlier

with DATs for excessive periods of time and denying them consideration for DAT release on the grounds of their perceived participation in protests and (2) policy and practice of using plastic flex cuffs as unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed);

c.  *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers including Defendant Monahan, arrested them and "the police deliberately held [protesters] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

d.  *Haus v. City of New York,* 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." *See also Larsen v. City of New York, et al.*, 04-cv-0665 (RWS) (S.D.N.Y.);

e.  *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as encircling protesters, striking them with nightsticks, and using extremely tight plastic handcuffs in their arrest;

f.  *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell. v. City of New York*, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), *Schiller. v. City of New York*, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04-cv-7921 (RJS)(JCS) (S.D.N.Y.), *Kyne v. Wolfowitz,* 06-cv-2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller*, No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04-cv-7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiffs' motions for

summary judgment on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

g.   *Callaghan v. City of New York,* 07-cv-9611 (PKC)(JLC) (S.D.N.Y.) (including the Third Amended Complaint, Dkt. No. 14) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading *Monell* claims virtually identical to the core *Monell* claims pleaded herein));

h.   *Osterhoudt v. City of New York, et al.,* No. 10-cv-3173 (RJC)(RML), 2012 WL 4481927, at *1-2, (E.D.N.Y. Sept. 27, 2012) (and the Second Amended Complaint and Demand for Jury Trial, Dkt. No. 22) (denying defendants' motion to dismiss *Monell* claims where plaintiff, who was arrested on during mass arrest on election night in November 2008, cited other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 RNC, and the WEF including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis");

i.   Despite (then-Mayor Michael Bloomberg's recognition that, "the majority of the [OWS] protesters have been peaceful and responsible,"[6] there were more than ninety civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.,* 14-cv-5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 ¶ 89) (listing by caption and docket numbers of many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgments and many resulted in substantial settlements prior to trial including *Gerskovich v. Iocco,* 15-cv-7280 (S.D.N.Y. Berman, J.) that settled for $256,000 prior to trial, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions;

j.   In *Peat v. City of New York,* No. 12-cv-08230 (S.D.N.Y.), fifteen OWS plaintiffs arrested on January 1, 2012, on the sidewalk in the East Village settled a case with Defendant City of New York for $598,000. The settled complaint alleged that plaintiffs were peacefully and lawfully protesting when executive members of the NYPD blocked their path on the sidewalk,[7] encircled them on three sides and a

---

[6] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*, The Guardian (Nov. 15, 2011,

8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-park.

[7] In March and April 2012, NYCLU issued Free Speech Threat Assessments detailing the NYPD's restriction on protester activity and engaging in a manner to obstruct protester's ability to engage in First Amendment activity and identified how executive "supervising officers, at

building line on the fourth side. The NYPD made dispersal announcements without providing sufficient time or a path of egress as members of the scooter task force blocked the protesters path of egress;

k.    Other OWS-related cases settled after discovery as they awaited trial, including two cases involving failure to train claims similar to those at issue in this case: *Packard* v. *City of New York* 15-cv-7130 (S.D.N.Y.) (AT) (settled for $1,030,000) and *Case v. City of New York,* 14-cv-9148 (S.D.N.Y.) (AT)*;*

l.    The Plaintiffs in *Case, et al. v. City of New York, et al.*, 14-cv-9148 (AT)(BCM) were arrested at an Occupy Wall Street protest and subjected to certain NYPD large-scale arrest processing rather than being released on the street with a summons as a result, including *Monell* claims with much in common with many of those raised herein. *See Case v City of NY*, 233 F. Supp. 3d 372 (SDNY 2017); 408 F.Supp.3d 313 (SDNY 2019);

m.    The Union Square litigations related to the mass arrests that occurred in and around Union Square Park on September 24, 2011, alleged similar NYPD misconduct that is alleged in this pleading, including, failure to provide reasonable dispersal orders and opportunity to disperse, unnecessary and excessive force used on protesters and overall efforts of the NYPD to deter and demoralize protesters. Nearly all of these cases include multiple plaintiffs and were all settled by the City of New York, including *Clarke v NYC*, 13-cv-(RWS); *Crisp v. NYC,* 12-cv-5482(RWS); *Dedrick v. NYC*, 12-cv-7165(RWS); *Dierken v. NYC*, 12-cv-7462(RWS); *Elliot v. NYC*, 12-cv-992(RWS); and *Hanlin v. NYC*, 12-cv-5844(RWS);

n.    Those cases OWS related cases referenced herein, *Gerskovich, Packard, Case, Peat,* the Union Square Litigations, as well *as* several other OWS-related cases, included failure to train *Monell* claims concerning protest activity that are similar to the *Monell* claims in this litigation;

o.    The incidents discussed in the 2003 NYCLU special report created by the NYCLU in the wake of the February 15, 2003 antiwar demonstration, titled *Arresting Protest*, published April 2003, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_arresting_protest.pdf;

p.    The incidents discussed in the 2005 NYCLU special report created by the NYCLU in the wake of protests at the RNC, titled *Rights and Wrongs at the RNC*, published in 2005, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf;

---

random and without warning, pointed to protesters they wanted arrested for disorderly conduct, unreasonable noise, resisting arrest and obstructing governmental administration." https://www.nyclu.org/en/nyc-free-speech-threat-assessment.

q.   The incidents discussed in the research compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication titled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street*, published July 25, 2015, *available at* http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

r.   *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including *Monell* allegations challenging many of the same policies and practices herein, *see, e.g.,* First Amended Complaint at Paragraph 415).

***The NYPD's Failure to Train Regarding Protest Policing***

63. Since at least the 1990s, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

64. In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

65. In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

66. Upon information and belief, to this day, that document forms the core the NYPD protest response-related training.

67. The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to *deter, disperse, and demoralize* groups, including by staging overwhelming presence and force at protest activity, as well as making early and "pro-active" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

68. Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – using the trainings' terminology – "disperse and demoralize" protesters.

*69.* These disperse and demoralize tactics and trainings have persisted through the present as exemplified by the experiences of the Named Plaintiffs and Class Members in this case.

70. Upon information and belief, Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

71. However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

*72.* On information and belief, there was, and is, virtually no NYPD training—and certainly no *meaningful* NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

73. Defendants' failures to train, which led to violations of Plaintiffs' rights in this case, include, *inter alia,* the following:

    a.    The failure to provide constitutionally meaningful dispersal orders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply, and the like;

    b.    The failure to make clear the need for individualized probable cause to arrest in a protest context;

    c.      The need failure to provide training on the need for fair warning and a meaningful opportunity to comply with police directions as a prerequisite for probable cause to arrest for a Curfew Order violation;

    d.      The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies;

    e.      The failure to provide training on the need for, or tactics regarding, escort and facilitation of First Amendment activities, and instead focuses almost exclusively on tactics designed to "disperse and demoralize" protesters;

    f.      The failure to provide training on the proper application and removal of flex-cuffs, including how to measure the appropriate tension on flex cuffs; how to assess the need to remove flex-cuffs; how long flex-cuffs may be worn before a significant risk of nerve damage develops; the safest types of flex-cuffs to use (for example, flex-cuffs with a double-locking feature and padding); the safest types of removal equipment to use and how to use removal equipment properly so as not to accidentally tighten flex-cuffs further in the process of removal; and other topics related to the use of flex-cuffs; and

    g.      The failure to provide training on the importance and need for NYPD members to wear masks during the COVID-19 pandemic, to provide masks for arrestees, and to allow arrestees to engage in mask-wearing, social distancing, handwashing, and other, similar safety measures in light of the COVID-19 pandemic.

*74.* Although many of the above problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, Defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and disciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

75. The SRG, deployed around the City at protests in 2020 including those that are the subject of this lawsuit, was created in 2015 as a specialized unit tasked with responding to disorder-causing events and to conduct counter-terrorism operations.

76. The SRG has a unit in each of the five boroughs and the DCU has now been incorporated into the SRG.

77. In response to the public's skepticism that the SRG would be used to crack down on protests, then-Chief of Department James O'Neill stated: "They will not be involved in handling

protests and demonstrations. They'll have no role in protests. Their response is single-fold. They'll be doing counter-terror work. They'll be assigned to different posts throughout the city."[8]

78. However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the present lawsuit.

79. Many SRG members, including many of those deployed to the protests in 2020 that are the subject of this lawsuit, have histories of engaging in the kinds of misconduct complained of herein, documented among other places, by CCRB complaints, and in numerous lawsuits.[9]

80. SRG members are meant to have additional DCU training.

81. Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

82. However, many of the officers deployed to respond to the protests in 2020 did not even receive *that* training, which was supposedly required of them.

83. As a result, as noted in the OCC Report, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protests was limited to what they had received as recruits in the Academy."[10]

84. Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects

---

[8] Ben Yakas, *NYPD: Fine, Maybe We Won't Police Protests With Machine Guns*, Gothamist, Jan. 30, 2015, *available at* https://gothamist.com/news/nypd-fine-maybe-we-wont-police-protests-with-machine-guns.

[9] Ali Winston, *NYPD Unit At Center Of Protest Policing Has Dozens Of Officers With Long Misconduct Histories,* The Appeal, Oct. 15, 2020, *available at* https://theappeal.org/nypd-srg-misconduct/.

[10] OCC Report at 37.

of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with crowd control while policing protests; documented in complaints to the Civilian Complaint Review Board and other agencies; as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

85. Indeed, in connection with the 2002 World Economic Forum and the 2004 RNC policing operations, NYPD supervisors – including DCU supervisors charged with designing and implementing NYPD protest policing-related policies and related training – routinely created "after action reports" that documented and critiqued NYPD plans for and responses to protest activities.

86. For example, in a March 17, 2006 *New York Times* article that was published while discovery about related policies and practices was ongoing in the 2004 RNC litigations, "Police Memos Say Arrest Tactics Calmed Protest," Jim Dwyer reported on the revelation of 2002 WEF after-action reports in then-ongoing litigation, *Allen v. City of New York*, 03-cv-2829 (KMW) (GWG) (SDNY).[11]

87. Those reports praised employing militarized tactics such as the "staging of massive amounts" of officers in riot gear including riot helmets and militarized "equipment" such as armored vehicles, prisoner wagons, and buses in view of demonstrations in order to "cause them to be alarmed" and as a "deterrent" as well as the use of "proactive" arrests in order to have a "powerful psychological effect" on protesters.

---

[11] Jim Dwyer, "Police Memos Say Arrest Tactics Calmed Protest," N.Y. Times, March 17, 2006, available at https://www.nytimes.com/2006/03/17/nyregion/police-memos-say-arrest-tactics-calmed-protest.html.

88. After the 2002 WEF after-action reports were disclosed in *Allen* and the 2004 RNC-related after-action reports were disclosed in the RNC litigations, and some of them were made public as a result, upon information and belief, rather than continuing to create such reports frankly documenting and assessing the NYPD's protest policing-related policies and tactics, the NYPD opted to stop creating such records.

89. For example, according to the Corporation Counsel's report, NYPD records do not show any protest-related after action reviews undertaken between the 2004 Republican National Convention until the events of the George Floyd protests.

90. Nevertheless, upon information and belief, at all times relevant herein, Defendants de Blasio, Shea, Monahan, and other defendant City policymakers, routinely received reports regarding arrests made in connection with First Amendment assemblies, including through internal reports such as Unusual Occurrence Reports; Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the status and/or dispositions of the cases; internal critiques from supervisors and other officers involved in mass arrests related to police actions taken in relation to an event; and/or other reports including information arrests, use of force protest arrest processing, and/or related prosecutions.

91. Despite the wealth of evidence of NYPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it relates to constitutionally compliant protest policing.

92. For example, in a deposition in *Packard v. City of New York,* 15-cv-7130 (S.D.N.Y.) (AT), a witness for the City of New York testified that in regard to protest police training it did not review (i) decline to prosecute decisions, (ii) conviction conversion rates or (iii) allegations and settlements in lawsuits relating to protest.

93. As another example from the same deposition, Defendant City apparently does not take allegations in lawsuits filed by protesters claiming they were falsely arrested during protests into account in considering its protest policing-related policies and training, in effect taking the position that there is nothing to be learned from lawsuits and settlements.

94. For example, in a 2017 deposition, a Fed. R. Civ. P. 30(b)(6) witness designated to testify on sidewalk policy protesting, dispersal orders, and training on probable cause standards for crimes commonly charged in protest policing by the Defendant City could identify no impact that litigation against Defendant City between 2000 and 2011 had on Defendant City's relevant policies, practices, customs, or NYPD training.

95. Relatedly, according to the Corporation Counsel, "the NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests."[12]

96. At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests— despite having received clear notice that NYPD policing of protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates both a history and a

---

[12] OCC Report at 2, 30.

policy, of disregard for the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights of Plaintiffs and other similarly injured protesters.

***The NYPD's Policy and/or Practice of Using Excessive Force to Control the Speech of Protestors***

97. Defendants used types and levels of force that were excessive and unnecessary force against the Plaintiffs and other similarly situated protestors.

98. In many cases, those uses of force were in contravention of, or inconsistent with, related, written NYPD policies and/or training.

99. In many cases, Defendants failed to document, and/or require that fellow Defendants and/or other fellow officers document, uses of force in accordance with related NYPD policies and/or training.

100.    In many cases, Defendants used force against Plaintiffs based on their position in or proximity to a perceived group, without first having given the perceived group clearly communicated prior notice as well as a meaningful opportunity to comply with police orders and/or dissociate with the perceived group.

101.    In many cases, Defendants used types of force, such as deploying pepper spray, that they knew, or should have known, would impact numerous people at one time, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether those uses of force were necessary, justified, or reasonable under the circumstances.

102.    Additionally, Plaintiffs and others arrested at the protests that are the subject of this litigation were handcuffed with their wrists together and their hands behind their back with plastic flex-cuffs.

103.    In many cases, Plaintiffs and/or other arrestees complained about the fact that their flex-cuffs were too tight and/or causing them injury.

104.    Specifically, because they were arrested at a protest, Plaintiffs were subjected to flex-cuffing pursuant to Defendants' Protest Arrest Processing Policies, in connection with which Defendant City did not supply Defendants with enough of cutting tools with which to loosen or remove flex-cuffs, or *any* flex-cuff pads, which are designed to prevent the very types of injuries Plaintiffs and other arrestees suffered as a result of having flex-cuffs applied to them.

105.    It was no secret to Defendants that using flex-cuffs to restrain protesters— including without providing adequate numbers of cutting tools or any protective padding—would result in injuries to protesters, of the sort that appropriate policies, training, and/or supervision would have avoided.

106.    For example, *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) was a class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, the NYPD's then-policy and practice of using plastic flex cuffs as "unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed."

107.    Plaintiffs in *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, also raised *Monell* claims around NYPD members' use of extremely tight, plastic handcuffs.

108.    Additionally, in *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.), the Court certified a "Conditions of Confinement Class, comprising all RNC arrestees who were

handcuffed with plastic flex cuffs." *See MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011).

109.    Those cases, and many others, challenged the City's and NYPD's policies and practices regarding the use of flex-cuffs to restrain protesters, and put the Defendants in this case on notice of the

110.    Relatedly, the DOI Report found, "When voicing those concerns to their arresting officers or other officers in the area, arrestees were told that the officers lacked the necessary equipment to remove the flex-cuffs. Arrestees therefore had to wait, oftentimes for long periods, until they got to their respective arrest processing center so that flex-cuffs could be removed."[13]

***Defendants' Policies and Practices Regarding Arrests—Including Mass Arrests—Without Fair Warning***

111.    In many cases, Defendants seized Plaintiffs based on the perception that they were part of a perceived group, without having made an individualized determination that there was probable cause to arrest the Plaintiff in question based on their own, individual conduct, as opposed to the perceived "group conduct."

112.    In many cases, Defendants failed to give constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making arrests where such notice and opportunity were required.

113.    For example, with respect to Plaintiffs who were arrested in connection with perceived violations of Defendant de Blasio's Curfew Orders, or for perceived violations of New York Penal Law § 240.20(6) (Disorderly Conduct – Failure to Obey Lawful Dispersal Order),

---

[13] *See, e.g.,* DOI Report at 42. *See also,* AG Report at 29 ("Officers kept the [flex-cuffs] on their wrists even after they were placed in cells, which, for some, cut off their circulation or caused other injuries to their wrists, including cuts and nerve damage.").

Defendants failed to give constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making such arrests, and/or ensure that each such arrested Plaintiff had the state of mind required for such arrest.

114.   With respect to Defendant de Blasio's Curfew Orders, the plain language of Defendant de Blasio's Curfew Orders required both (a) a knowing violation of the Executive Order prior to any arrest *and* (b) that any arrest could only follow a dispersal order, a meaningful opportunity to disperse, and a person's refusal to comply with the order.

115.   As pleaded elsewhere herein, Defendants enforced the Curfew Orders by arresting Plaintiffs and other protesters without first ensuring that they had been given dispersal orders, meaningful opportunities to disperse, and refused to comply, under circumstances in which they had not ensured that arrestees had knowingly violated the Curfew Orders.

116.   That enforcement was consistent with official NYPD policy.

117.   For example, in a September 16, 2020 letter from NYPD Deputy Commissioner of Legal Matters Ernest F. Hart to Ida Sawyer, Acting Crisis and Conflict Director, Human Rights Watch,[14] Deputy Commissioner Hart stated that officers who merely "observed individuals who were not essential workers in public…[t]hat observation provided officers with probable cause to take, at a minimum, enforcement for Administrative Code § 3-108, Violating a Mayoral Executive Order, a 'B' Misdemeanor."

118.   Additionally, in many cases, Defendants enforced other provisions of New York law against Plaintiffs and other perceived protesters without probable cause and/or without first

---

[14] Available at https://www.hrw.org/sites/default/files/media_2020/09/Annex%20II_0.pdf.

having given constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making such arrests.

119.    For example, with respect to Plaintiffs who were arrested in connection with perceived violations of P.L. § 240.20(5) (Disorderly Conduct – Blocking Pedestrian or Vehicular Traffic), Defendants failed to ensure that each such arrested Plaintiff had caused a criminally significant blockage of traffic, and/or to ensure that each such arrested Plaintiff had the state of mind required for such arrest.

120.    By way of further example, with respect to Plaintiffs who were arrested in connection with perceived violations of New York Vehicle and Traffic Law § 1156(a) (Pedestrians on Roadway), Defendants failed to ensure that each such arrested Plaintiff had notice that they were allegedly violating the law by walking along and/or upon a roadway and/or a meaningful opportunity to conform their conduct to the law in order to avoid being arrested.

121.    Defendants enforced provisions of New York law against Plaintiffs that Defendants typically exercise their discretion not to enforce, or not to make arrests in connection with – for example, VTL § 1156(a), which involves walking along or upon a roadway when an adjacent and usable sidewalk is available – the equivalent of jaywalking, an everyday offense that Defendants all but ignore in the City.

122.    In many cases, Defendants employed a crowd control tactic in which Defendants pushed and/or corralled and/or otherwise physically trapped perceived groups including Plaintiffs and other perceived protesters, including by kettling, without first having given Plaintiffs and the others so pushed and/or corralled and/or trapped meaningful notice and an opportunity to disperse or otherwise change their conduct in order to avoid being so pushed and/or corralled and/or trapped.

123.    Plaintiffs amount an as-applied, First Amendment-based challenges to the application of NYC Administrative Code § 3-108; PL §§ 240.20(5) and/or 240.20(6); and/or VTL § 1156(a) to their conduct and the events leading up to their arrests, as well as to their related charging and/or prosecutions.

*Defendants' Failure to Monitor and Supervise NYPD Members' Protest Policing*

124.    Although Defendant City actually knew, or should have known, that NYPD members were engaging in or had engaged in the unconstitutional conduct complained of herein, they failed to monitor, supervise, and/or discipline NYPD members who directed, engaged in, or observed such conduct.

125.    Defendant City's policy makers have, instead, repeatedly failed to discipline NYPD members for misconduct at protests.

126.    Multiple commissioners of the NYPD have had a practice of essentially blocking all meaningful discipline for misconduct at protests. *See generally, e.g., N.Y.P.D. Rejected Over Half of Review Board's Discipline Recommendations*, N.Y. TIMES (Mar. 13, 2023).

127.    Likewise, high ranking members of the NYPD have repeatedly encouraged lower ranking officers to "play" and "have fun," in their words, "kicking [the] ass" of protesters. *See, e.g.,* Exhibit, *Rodriguez v. City of New York*, ECF No. 107-1, 21-cv-10815 (SDNY).

**DEFENDANTS' IMPOSED RESTRICTIONS**

128.    Defendants (a) imposed restrictions on such protected speech and/or conduct that violated Plaintiffs' First Amendment rights, including, but not limited to, in falsely arresting Plaintiffs, in subjecting Plaintiffs to excessive force, in selectively enforcing laws and regulations against Plaintiffs, in subjecting Plaintiffs to Defendants' Protest Arrest Processing Policies, and in

otherwise violating Plaintiffs' rights and engaging in the acts and omissions complained of herein.

129.    In addition to being retaliatory, the restrictions Plaintiffs complain of herein, which Defendants imposed on Plaintiffs' First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment on the streets, were themselves regulations on Plaintiffs' protected conduct that:

a.    Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, alternately,

b.    Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Plaintiffs' protected expression, including in that Plaintiffs' abilities to communicate effectively were threatened; and/or

c.    Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiffs' abilities to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

d.    Amounted to the imposition of strict liability on Plaintiffs for engaging in protected speech and/or expression.

**FIRST CAUSE OF ACTION**
**(Section 1983 False Arrest Claim Against the Individual Defendants)**

130.    Plaintiffs hereby reallege and incorporate all of the preceding paragraphs as though they were fully set forth herein.

131.    The individual defendants willfully and intentionally seized, searched, detained, and arrested plaintiffs, and caused them to be imprisoned, without probable cause, and without a reasonable basis to believe such cause existed.

132.    Plaintiffs had not been engaged in any criminal conduct, nor were they engaged in any conduct that could reasonably be viewed as criminal nor a basis to justify their arrest.

133.    Despite the absence of sufficient legal cause, plaintiffs were arrested and jailed.

134.    By so doing, the individual defendants subjected plaintiffs to false arrest and imprisonment, and thereby violated and aided and abetted in the violation of plaintiffs' rights under the Fourth Amendment of the United States Constitution.

135.    By reason thereof, the individual defendants have violated 42 U.S.C §1983 and caused plaintiffs to suffer the deprivation of their liberty, loss of their constitutional rights, physical injuries, and mental anguish.

**SECOND CAUSE OF ACTION**
**(Section 1983 Denial of a Fair Trial Claim Against the Individual Defendants)**

136.    Plaintiffs hereby reallege and incorporate by reference all of the preceding paragraphs as though they were fully set forth herein.

137.    The individual defendants willfully and intentionally fabricated evidence by falsely memorializing claims to have witnessed plaintiffs engaging in criminal or unlawful activity, and then forwarded these materially false claims to the New York County District Attorney's Office in order to justify the arrest of plaintiffs, and to justify, bringing about and cause plaintiff to be deprived of their liberty and to be criminally prosecuted.

138.    By so doing, the individual defendants subjected the plaintiff to denial of a fair trial and violation of their right to due process by fabricating evidence and otherwise providing prosecutors with a materially false and misleading version of events, and thereby violated plaintiff's rights under the Fourth, Sixth, and Fourteenth Amendments of the United States Constitution.

139.    By reason thereof, the individual defendants have violated 42 U.S.C. §1983 and caused

plaintiff to suffer the deprivation of their liberty, loss of their constitutional rights, physical injuries, and mental anguish.

### THIRD CAUSE OF ACTION
**(Section 1983 Excessive Force Claim Against the Individual Defendants)**

140.    Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

141.    As a result of the foregoing, defendants subjected plaintiff to excessive force, in part, by causing their body to slam to the ground, and causing their to suffer injuries, with no legal basis, justification or excuse.

142.    As a result of the defendants' conduct, the plaintiff was subjected to a level of force by the defendants in excess of what was reasonable under the circumstances.

143.    As a result of the foregoing, plaintiff's liberty was restricted and they were put in fear for their physical safety without probable cause or any legal justification, and they were physically injured.

### FOURTH CAUSE OF ACTION
**(First Amendment Retaliation through 42 U.S.C. Section 1983 and related New York State Constitutional Provisions against All Defendants)**

144.    "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006); Dorsett v. Cty. of Nassau, 732 F.3d 157, 160 (2d ll Cir. 2013); *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) (First Amendment prohibits "adverse governmental action taken against an individual in retaliation" for protected activities.).

145.    As a result, even some government actions that would be otherwise lawful become prohibited if in response to protected speech or petition. "Because government retaliation

tends to chill an individual's exercise of his First Amendment rights, public officials may not, as a general rule, respond to an individual's protected activity with conduct or speech even though that conduct or speech would otherwise be a lawful exercise of public authority." *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 688 (1996). The First Amendment thus bars officials' actions where they "caused [the speaker] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity" and were "substantially motivated against the plaintiffs' exercise of constitutionally protected conduct." *See Keenan*, 290 F.3d at 258.

146.    The right to protest is at the heart of the First Amendment, as is the right to publicly and loudly criticize public officials.

147.    The Defendants actions, collectively and through *respondeat superior*, constitute illegal First Amendment retaliation in that (1) Plaintiff was exercising a right protected by the First Amendment; (2) the use of excessive force, arrest, and imposition of criminal charges, as well as the falsification of charges, and the denials of process, were motivated or substantially caused by the exercise of that right; and (3) those actions caused injury. *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

148.    Even in the generally fraught criminal context, merely "[b]eing subjected to criminal charges is a cognizable concrete harm." *Higginbotham v. City of New York*, 2015 WL 2212242, at *11 (SDNY May 12, 2015). Here, Sergent's protected speech was the but-for cause of the Defendants use excessive force and false arrest against Plaintiff.

149.    The Defendant City of New York is liable under this claim under *respondeat superior* for failure to train member of the NYPD and the Defendants in the lawful and proper discharge of their professional obligations including, but not limited, the requirement that they not

violate the constitutional rights of citizens.

150.    By reason thereof, Defendants have caused Plaintiff to suffer emotional and physical injuries, mental anguish, the loss of their constitutional rights, and unlawful incarceration.

## FIFTH CAUSE OF ACTION
### (Section 1983 *Monell* Claim Against the Municipal Defendant)

151.    Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

152.    Defendant City of New York was responsible for ensuring that reasonable and appropriate levels of supervision were in place within and/or over the NYPD.

153.    Defendant City of New York had actual or constructive knowledge that there was inadequate supervision over and/or within the NYPD with respect to its members' abuse of their authority, abuse of arrest powers, excessive force, and fabrication of evidence, and other blatant violations of the United States Constitution and the rules and regulations of the NYPD.

154.    Despite ample notice of inadequate supervision, defendants took no steps to ensure that reasonable and appropriate levels of supervision were put place to reasonably ensure that NYPD members engaged in police conduct in a lawful and proper manner, including their use of their authority as law enforcement officers with respect to the general public, including, and specifically, the plaintiff herein.

155.    Defendant City of New York deliberately and intentionally chose not to take action to correct the chronic, systemic, and institutional misuse and abuse of police authority by its NYPD employees, and thereby deliberately and intentionally adopted, condoned, and otherwise created through deliberate inaction and negligent supervision, an NYPD policy, practice, and custom of utilizing illegal and impermissible searches, arrests, and detentions, excessive force, and the manufacturing of evidence, in the ordinary course of NYPD business

in flagrant disregard of the state and federal constitutions, as well as the Patrol Guide, up to and beyond the plaintiff's arrest.

156.    The acts complained of herein are a direct and proximate result of the failure of the City of New York and the NYPD properly to select, train, supervise, investigate, promote and discipline police and correction officers and supervisory officers.

157.    The failure of the City of New York and the NYPD properly to select, train, supervise, investigate, promote and discipline police and correction officers and supervisory officers constitutes gross and deliberate indifference to unconstitutional conduct by those officers.

158.    The official policies, practices and customs of the City of New York and the NYPD alleged herein violated plaintiff's rights guaranteed by 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the Constitution of the United States.

159.    All of the acts and omissions by the individual defendants described above were carried out pursuant to overlapping policies and practices of the municipal defendant in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures, and rules of the City and the NYPD, all under the supervision of ranking officers of the NYPD.

160.    Therefore the municipal defendant has not only tolerated, but actively fostered a lawless atmosphere within the NYPD and that the City of New York was deliberately indifferent to the risk that the inadequate level of supervision would lead to the violation of individuals' constitutional rights in general, and caused the violation of the plaintiff's rights in particular.

161.    By reason thereof, the municipal defendant has violated 42 U.S.C. §1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of their constitutional rights.

**SIXTH CAUSE OF ACTION**
**(Civil Rights Violations Pursuant to New York State Law**
**Against the Individual and Municipal Defendants)**

162.    Plaintiff repeats the allegations contained in each of the foregoing paragraphs as though stated fully herein.

163.    Plaintiff was subjected to false arrest, excessive force, denial of due process and fair trial, through the defendants' use of unreasonable force, fabricated evidence and the making of false statements.

164.    At no time did defendants have any legal basis for arresting plaintiff, subjecting their to prosecution, or commencing criminal process against her, nor was there any reasonable basis to believe said conduct set forth herein was lawful, reasonable, or otherwise appropriate.

165.    The defendants are therefore liable under New York law to plaintiff for false arrest, excessive force, denial of due process and fair trial.

166.    By reason thereof, defendants have caused plaintiff to suffer emotional and physical injuries, mental anguish, the loss of their constitutional rights, and unlawful incarceration.

**DEMAND FOR A JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38, plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

WHEREFORE, the plaintiff demands judgment against the individual defendants and the City of New York as follows:

i.    actual and punitive damages against the individual defendants in an amount to be determined at trial;

ii.    actual damages in an amount to be determined at trial against the City of New York;

iii.    statutory attorney's fees pursuant to, inter alia, 42 U.S.C. §1988 and New York

common law, disbursements, and costs of the action; and

iv.   such other relief as the Court deems just and proper.

Dated:  New York, New York
        September 13, 2024

                                        ELENA L. COHEN

                                                /s/

                            By:   _____
                                  COHEN&GREEN P.L.L.C.
                                  1639 Centre Street, Suite 216
                                  Ridgewood, NY 11385
                                  Tel.: 929-888-9480
                                  elena@femmelaw.com